**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| **POLLY GAZA,** | ) |
| **Plaintiff,** | ) |
| **v.** | ) No. 2:23−cv−00318 |
| | ) |
| **NORTHERN PLANT SERVICES, LTD.** | ) |
| **MICHAEL S. SUTTER; and JERRI SUTTER** | ) |
| **Defendants.** | ) |

### FIRST AMENDED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff POLLY GAZA, by her undersigned attorneys and pursuant to 28 U.S.C.A. § 2201(a), as her Complaint for Declaratory and Other Relief ("Complaint") against defendants NORTHERN PLANT SERVICES, LTD., an Indiana Corporation, MICHAEL S. SUTTER, a citizen of Indiana, and JERRI L. SUTTER, a citizen of Indiana, states as follows:

### NATURE OF ACTION

1.    This is a close corporation majority shareholder oppression action for declaratory judgment, breach of fiduciary duty and wrongful termination brought by one of the founding shareholders of a highly successful, 23-year-old environmental, industrial cleaning and waste management company against the two other majority co-founding shareholders who, following the death of the fourth co-founding shareholder (plaintiff's ex-husband), wrongfully terminated plaintiff's employment as an officer of the company.

2.    As alleged below, termination of Plaintiff's employment by Defendants, her co-founding shareholders, purportedly "for cause" was as a pretext for improperly attempting to force Plaintiff to redeem her stock in the company for an outrageously and oppressively low purchase price – at least $1.5 million below the value of her 33% ownership interest in the company – supposedly pursuant to a buy-sell agreement among the co-founding shareholders.

1

## PARTIES

3.      Plaintiff Polly Gaza ("Gaza") is a citizen of Michigan who at all relevant times has resided in New Buffalo, Michigan.

4.      Defendant Northern Plant Services, Ltd. ("NPS") is an Indiana corporation with its principal place of business in Portage, Indiana.

5.      Defendant Michael S. Sutter ("Michael") is a citizen of Indiana who at all relevant times has resided in Chesterton, Indiana.

6.      Defendant Jerry L. Sutter ("Jerri") is a citizen of Indiana who at all relevant times has resided in Chesterton, Indiana.

7.      Michael and Jerri (collectively "Sutters") at all relevant times have been married to each other.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based upon diversity jurisdiction.  Gaza and all Defendants are citizens of different States, and the amount in controversy exceeds $75,000 exclusive of attorneys' fees and costs.

9.      This Court has personal jurisdiction over Defendant NPS.

10.     This Court has personal jurisdiction over the individual Sutter Defendants.

11.     This Court is a proper venue for this matter pursuant to 28 U.S.C. § 1391 because Defendants reside in this judicial district and a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## ALLEGATIONS COMMON TO ALL COUNTS

12.    NPS is an environmental and industrial cleaning waste management business serving the transportation, steel, refining, power, chemical, and auto industries in Indiana, Illinois and other states.

13.    Gaza, her deceased ex-husband Donald Gaza ("Donald") and the Sutters created NPS in 1999, building it from the ground up with modest capital provided primarily by Gaza and Donald.

14.    At all relevant times from inception of NPS in 1999 and through the time of Donald's death when he took his own life on August 24, 2020, Gaza and Donald each owned 25 of the 100 issued and outstanding shares of NPS stock; Michael owned 24 of the said issued and outstanding shares; and Jerri owned 26 of said shares.

15.    NPS became a profitable business within a matter of years of its initial operations, and by 2010 through 2019 (pre-pandemic), on gross revenue exceeding $4.0 million generated annual pre-tax income in the form of officers' compensation and shareholder distributions of more than $200,000 each to Donald, Gaza and the Sutters including substantial additional employee benefits each of them received from NPS.

16.    From inception of NPS through the time of his death, as NPS President Donald was the primary driving force behind the company's operations, development and growth.

17.    At all relevant times from inception of NPS through the present, Michael was a director and Vice President of NPS and, after Donald's death, succeeded him as NPS President.

18.    At all relevant times from inception of NPS through early April 2022, Jerri has been the Secretary and a director of NPS, and Gaza was the Treasurer and a director of NPS.

19.    From the inception of NPS through the time of his divorce from Gaza in March 2017, Donald maintained a business office at their home in New Buffalo, Michigan, where he

regularly worked in performing his duties as President of NPS – including during the several weeks before his death.

20.     From the inception of NPS through approximately 2010, as Treasurer of NPS, Gaza was the NPS officer primarily responsible for day-to-day management of NPS financial and administrative operations, which for many years required that she devote extraordinary personal effort and long working hours to perform these duties – which she did both at NPS business offices in Portage, Indiana, and from her home in New Buffalo, Michigan.

21.     In the years leading up to Donald's death in August 2020, NPS hired managerial and administrative employees to perform most of the day-to-day management duties Gaza previously had performed as NPS Treasurer and that Jerri had previously performed as NPS Secretary – making it no longer necessary, except sporadically, for Gaza and Jerri to be physically present at NPS business offices in Portage, Indiana, to perform their duties as employees of NPS.

22.     Throughout its history, as Michael publicly acknowledged in words or substance at Donald's funeral on August 29, 2020, speaking to Donald's family, friends and NPS employees who were in attendance, through her years of service at and dedication to NPS, Gaza's "drive [and] grit . . . was the very vertebrae in the backbone of this company" and the reason Michael stated that "I'll always love ya" and that he and "the crew at Northern" were "not gonna let you down" and "be with you, alright" going forward.

23.     Following Donald's death in late August 2021 through September 2021, on numerous occasions at Gaza's home in New Buffalo, Michigan, in their capacities as NPS shareholders, directors and officers, Gaza and the Sutters held business meetings to discuss the future of NPS corporate governance and various business operations ("August-September 2020 Meetings").

24.     During the August-September 2021 Meetings, when Gaza proposed that she resume actively participating in executive management of NPS financial, administrative and any other form of NPS business operations, "whatever the company needed," the Sutters urged Gaza not to do so because they were capable of handling all NPS executive functions.

25.     Apart from a temporary detrimental effect on NPS operations and profitability resulting from the ongoing pandemic that begin in early 2020, on information and belief, the sales, operational and financial performance of NPS has been suffering due to poor leadership and executive management by the Sutters, particularly Michael, since Donald's death.

26.     In March 2021, in the aftermath of Donald's death and funded by a life insurance policy it had purchased covering Donald, NPS purchased Donald's 25% shareholder interest from Donald's estate and his living trust for a purchase price of approximately $1.3 million pursuant to the terms of a Buy-Sell Agreement dated September 15, 2000 ("Buy-Sell Agreement") between NPS, Donald, Gaza, the Sutters and Northern Plant Services LLC (which owns Portage, Indiana real estate leased by NPS where NPS's principal place of business is located).  A copy of the Buy-Sell Agreement is attached hereto as Exhibit A.

27.     The roughly $1.3 million purchase price of Donald's shares of NPS, which was part of a combined total price of $1.5 million NPS paid for said shares and that Northern Plant Services, LLC ("LLC") paid for Donald's 25% LLC membership therein (said $200,000 portion paid by the LLC represented 25% of the total value of the Portage, Indiana real estate it owns which total value, at that time at most was roughly $800,000), was determined pursuant to Paragraphs 7 and 9 of the Buy-Sell Agreement.

28.     Paragraph 7 of the Buy-Sell Agreement states as follows:

7.      **Death of a Shareholder.**  Upon the death of a Shareholder, the Corporation shall purchase from the Estate of the deceased Shareholder and the personal

representative of the deceased Shareholder's estate shall sell the deceased Shareholder's Stock in the Corporation. The Corporation shall additionally purchase Stock from certain surviving Shareholders in such amounts that will equalize each surviving Shareholder's Stock ownership after such purchase. The purchase price and the terms of the purchase for any Stock purchased pursuant to the provisions of this paragraph shall be equal to the value as determined in Paragraph 9 of this Agreement.

29. Section 9 of the Buy-Sell Agreement in relevant part states as follows:

**9.     Purchase Price and Terms.**
a.     Value of Corporation
For the purposes of this Agreement, the Corporation shall be valued as of the date of this agreement, at a value of Twenty Thousand Dollars ($20,000.00), per each share of stock. This purchase price has been agreed upon by the Shareholders and the Corporation as representing the fair value of the stock of the Corporation. Within ninety (90) days following the end of each fiscal year, the Shareholders and the Corporation agree to redetermine the value of each share of Stock and shall indicate such value by endorsement on Schedule "B" attached hereto and made a part hereof. If, for any reason, the Shareholders and Corporation fail to redetermine the value for a particular year, the last previously stipulated value shall control.

30. At the time and by virtue of the NPS and LLC purchase of Donald's 25% shareholder interest in NSP and his 25% membership interest in the LLC in March 2021, NPS and its shareholders redetermined the value of each of the 100 shares of NPS stock at approximately $52,000 per share within the meaning of Paragraph 9.a of the Buy-Sell Agreement.

31. Until so redetermining the value of each share of NPS stock in March 2021, on information and belief, since executing the Buy-Sell Agreement in September 2000, the NPS shareholders had not previously redetermined the value of each share of NPS stock pursuant to Paragraph 9 of the Buy-Sell Agreement.

32. By reason of the NPS purchase of Donald's 25% shareholder interest in NPS stock from his estate and his living trust, and pursuant to written resolution of all NPS shareholders, Gaza and the Sutters thereafter each owned 33% of issued and outstanding shares of NPS stock.

33.    By reason of the foregoing March 2021 redetermination of the value of each of the 100 NPS shares that were issued and outstanding at that time pursuant to Paragraph 9.a of the Buy-Sell Agreement, the combined total redetermined value of said shares for purposes of Paragraph 9.a is approximately $5.2 million, and the correspondent redetermination of Gaza's 33% shareholder interest in NPS is approximately $1.73 million.

34.    Between the time Gaza and the Sutters met at Gaza's home for the August-September Meetings immediately following Donald's death and March 2022, neither of the Sutters informed Gaza that her duties and responsibilities as Treasurer and a director of NPS had changed from what they had been during the several years prior to Donald's death in August 2020, or that Jerrie's duties and responsibilities as Secretary and a director of NPS had so changed, and Gaza at all relevant times performed or stood ready, willing and able to perform any and all services NPS required of her.

35.    Between the time Gaza and the Sutters met at Gaza's home for the August-September Meetings immediately after Donald's death, and March 2022, Gaza continued receiving employment compensation, customary employee benefits, car allowance and shareholder distributions from NPS, on information and belief, on par with the Sutters as she had for the previous several years.  At all relevant times following the August-September Meetings, Gaza had a reasonable expectation that her foregoing owner's compensation would continue on par with the Sutters' compensation as co-owners of NPS.

36.    Pursuant to notice, the Sutters called and on March 3, 2022 conducted a meeting of the NPS shareholders at which time they informed Gaza that NPS was terminating her employment with NPS "for cause" while neither stating nor having any actual grounds whatsoever for doing so – followed only by the stated false, misleading and pretextual comment by the Sutters that Gaza

"has not been engaged in nor been in attendance at her employment with the Corporation for several years."

37.    Within a matter of days after the foregoing March 3, 2022 meeting of NPS shareholders, Gaza spoke with Mike by telephone after a written offer NPS had received in late February 2021 from Aims Companies (of Scottsdale, AZ) to buy 100% of the stock of NPS for $5.0 million in cash plus an amount equal to any NPS working capital in excess of "target working capital," and said to him "Mike, it seems like you're trying to squeeze me out of the company for as little money as possible."  Exposing the Sutters' pre-meditated betrayal of Gaza, Mike bluntly replied "Well, Poll, if you want to know the truth, that's right – we are."

38.    Through counsel, by letter dated April 6, 2022 ("Stock Acquisition Notice"), NPS notified Gaza that based on its purported termination of her employment with NPS "for cause", pursuant to the Buy-Sell Agreement, she is required to transfer her NPS stock to NPS "in exchange for a promissory note from the Corporation in the amount of the purchase price of Two Hundred Fifty Thousand Dollars ($250,000), payable over a period of six (6) years in equal, semi-annual payments, carrying an interest rate of seven percent (7%) per annum.  A copy of the foregoing Stock Acquisition Notice is attached hereto as Exhibit B.

39.    Paragraph 4 of the Buy-Sell Agreement states in relevant part as follows:

> **4.    <u>Sale of Stock During Lifetime – Termination for Cause.</u>**
> Because of the importance of full-time employment to the parties to this Agreement, if any Shareholder who is a party to this Agreement should be terminated from the service of the Corporation for cause, hereinafter referred to as "Termination for Cause", then, within sixty (60) days of said termination, said Shareholder shall make his Stock available for purchase by the Corporation.  The Corporation shall have the exclusive right to acquire said Stock, and the Corporation shall have the right to acquire said Stock by giving notice of acceptance to approve said Stock purchase within sixty (60) days from the date of Termination for Cause.  The purchase price and the terms of the purchase for any Stock purchased pursuant to the

provisions of this paragraph shall be equal to the value as determined for in Paragraph 9 of this Agreement.

40.    The April 6, 2022 Stock Acquisition Notice further informed Gaza of NPS's "exercise of its right to acquire all of [her] stock in the Corporation" and that "[a]s a result[, her] stock in the Corporation is now held in escrow by the Corporation, pending [her] formal transfer of the stock to the Corporation in exchange for said promissory note."

## COUNT I

### (Action Against NPS for Declaratory Judgment)

41.    As paragraph 41, Gaza repeats the allegations in paragraph 1 to 40 of this Complaint as if fully set forth herein.

42.    As alleged above, NPS terminated Gaza's employment on March 3, 2022, with no cause at all whatsoever and did so purportedly "for cause" only as a transparent pretext for the sole and wrongful purpose of attempting to involve the "Termination for Cause" provisions in Paragraph 4 of the Buy-Sell Agreement toward improperly and oppressively forcing Gaza to relinquish her shares of NPS stock in exchange for a price equaling a small fraction of their value.

43.    The April 6, 2022 Notice of Acquisition NPS counsel served on Gaza therefore is invalid, void and a legal nullity that neither requires her to transfer her NPS shares to NPS as demanded therein, nor otherwise impairs or otherwise affects Gaza's 33% shareholder interest in NPS or her rights as an NPS shareholder and director.

44.    Further, if under Section 4 of the Buy-Sell Agreement NPS's March 3, 2022 termination of Gaza's employment purportedly "for cause" for any reason enables NPS to force her involuntarily to relinquish to NPS her 33% shareholder interest in NPS, the falsity and gross bad faith grounds of NPS appears to have asserted for doing so constitutes a breach of either the terms of said Agreement or the duty NPS owes Gaza to exercise good faith and fair dealing in

enforcing the terms thereof, as a direct and proximate result of which Gaza will incur monetary loss and damage in an amount in excess of $1.5 million to be determined at trial.

45.    By reason of the events alleged above an actual controversy exists between Gaza and NPS within the meaning of 28 U.S.C.A. § 2201(a) thereby entitling Gaza to a declaration of her rights and NPS's obligations under the Buy-Sell Agreement as a result of NPS's attempt to invoke the same by means of its April 6, 2022 Notice of Acquisition.

WHEREFORE, Plaintiff POLLY GAZA prays for judgment on this Count I in her favor and against Defendants NORTHERN PLANT SERVICES, LTD., MICHAEL S. SUTTER, and JERRI L. SUTTER in the form of:

A.    A judicial declaration that the April 6, 2022 Notice of Acquisition that Defendant's counsel served on Plaintiff therefore is invalid, void, and a legal nullity;

B.    A judicial declaration that the April 6, 2022 Notice of Acquisition that Defendant's counsel serve on Plaintiff neither requires her to transfer her Northern Plant Services, Ltd. shares to Defendant as demanded therein;

C.    A judicial declaration that the April 6, 2022 Notice of Acquisition neither otherwise impairs or affects Plaintiff's 33% shareholder interest in Northern Plant Services, Ltd. or her rights as a Northern Plant Services, Ltd. shareholder and director;

D.    A judicial declaration that Plaintiff is entitled to an award of monetary damages in an amount exceeding $1.5 million to be determined at trial if under Section 4 of the Buy-Sell Agreement said Defendant's March 3, 2022 termination of Plaintiff's employment purportedly "for cause" for any reason enables said Defendant to force Plaintiff to involuntarily relinquish her 33% shareholder interest in Northern Plant Services, Ltd.; and

E.  Such other and further relief as the Court deems just and proper.

## COUNT II

### (Action Against Sutters for Breach of Fiduciary Duty)

46.    As paragraph 46, Gaza repeats the allegations of paragraphs 1 to 40 of this Complaint as if fully set forth herein.

47.    As majority shareholders of NPS, the Sutters at all relevant times owed Gaza, as a minority shareholder of NPS, fiduciary duties of loyalty, honest and the utmost of good faith.

48.    By their wrongful conduct as alleged above, the Sutters breached their fiduciary duties owed to Gaza.

49.    As a direct and proximate result of their foregoing breaches of their fiduciary duties to Gaza, she has been or will be damaged in an amount exceeding $1.5 million to be determined at trial.

WHEREFORE, Plaintiff POLLY GAZA prays for judgment on this Count II in her favor and against Defendants MICHAEL S. SUTTER and JERRI L. SUTTER in an amount exceeding $1.5 million to be determined at trial equal to loss suffered by her as a result of breach of fiduciary duty to Plaintiff as alleged herein plus exemplary and punitive damages in an amount to be determined at trial, attorney's fees and other costs by Plaintiff in prosecuting this action to the extent available under the law, and for such other and further relief as the Court deems just and proper.

## COUNT III

### (Action Against all Defendants for Wrongful Termination)

50.    As paragraph 50, Gaza repeats the allegations in paragraphs 1 to 49 of this Complaint as fully set forth herein.

51.     As alleged above, NPS terminated Gaza's employment on March 3, 2022, with no cause at all whatsoever and did so purportedly "for cause" only as a transparent pretext for the sole and wrongful purpose of attempting to invite the "Termination for Cause" provisions in Paragraph 4 of the Buy-Sell Agreement toward improperly and oppressively forcing Gaza to relinquish her shares of NPS stock in exchange for a prince equaling a small fraction of their actual value.

52.     As such, NPS's termination of Gaza's employment was wrongful and violated her ongoing contractual relationship with NPS as a shareholder and its Treasurer and in violation of the Sutters' fiduciary duties to Gaza as alleged in Paragraphs 47 to 49, above.

53.     As a direct and proximate result of Defendants' wrongful termination of Gaza's employment with NPS, she has been and will be damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff POLLY GAZA prays for judgment on this Count III in her favor and against Defendants NORTHERN PLANT SERVICES, LTD., MICHAEL S. SUTTER and JERRI L. SUTTER in an amount to be determined at trial equal to present and future loss resulting from Defendants' wrongful termination of her employment, plus pre-judgment interest, costs of suit and for such other and further relief as the Court deems just and proper.

## COUNT IV

### (Action Against All Defendants for Breach of Contract)

54.     As paragraph 54, Plaintiff Gaza repeats the allegations contained in Paragraphs 1 to 53 of this Complaint as fully set forth herein.

55.     The Buy-Sell Agreement is a validly executed contract signed by shareholders Donald Gaza, Polly Gaza, Michael S. Sutter, and Jerri L. Sutter.

56.    By terminating Plaintiff Gaza pretextually "for cause" and offering her a fraction of the value of her ownership in NPS, Defendants breached Paragraph 4 of the Agreement, titled: "Sale of Stock During Lifetime – Termination for Cause."

57.    Plaintiff has fully performed under the Buy-Sell Agreement.

58.    Plaintiff has been damaged by Defendants' breach of the Buy-Sell Agreement, including but limited to the deprivation of future earnings as well as the actual values of her membership in the company.

WHEREFORE, Plaintiff POLLY GAZA prays for judgment on this Count IV in her favor and against Defendants NORTHERN PLANT SERVICES, LTD., MICHAEL S. SUTTER and JERRI L. SUTTER in an amount to be determined at trial equal to present and future loss resulting from Defendants' breach of the Buy-Sell Agreement, the actual present value of her shares of NPS, plus pre-judgment interest, costs of suit and for such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY.**

Dated: February 26, 2024.

Respectfully submitted,

_____/s/Jeff Carroll_____
Jeff Carroll
**KORANSKY BOUWER & PORACKY, P.C.**
425 Joliet Street, Suite 425, Dyer, Indiana 46311
Phone: (219) 865-6700; (219) 865-5839 (fax)
jcarroll@kblegal.net
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of February 2024, I caused to be served upon all parties of record via email.

KORANSKY, BOUWER & PORACKY, P.C.
By: /s/ Jeff Carroll

# EXHIBIT A

## BUY-SELL AGREEMENT

**AGREEMENT**, made this 15th day of September, 2000, between Northern Plant Services, Ltd., an Indiana Corporation, hereinafter referred to as the "Corporation," Donald W. Gaza, Polly A. Gaza, Michael S. Sutter, and Jerri L. Sutter, all individuals, hereinafter referred to individually as "Shareholder" and collectively as "Shareholders," and Northern Plant Services, LLC, an Indiana limited liability company, hereinafter referred to as the "Trustee."

**WHEREAS**, the Corporation has heretofore issued one hundred (100) shares of stock, hereinafter referred to as "Stock," all of which are owned by the Shareholders in the following manner:

|                   | No. of Shares |
|-------------------|:-------------:|
| Donald W. Gaza    | 24            |
| Polly A. Gaza     | 26            |
| Michael S. Sutter | 24            |
| Jerri L. Sutter   | 26            |

**WHEREAS**, the Corporation is closely held and the Shareholders desire to promote their mutual interests and the interests of the Corporation by imposing certain restrictions and obligations on themselves, the Corporation and the Stock;

**WHEREAS**, the Shareholders desire to guard against the introduction into ownership of the Corporation of other persons who may be either unwilling or unable to contribute to the success of the Corporation, by restricting the privilege of owning Stock;

**WHEREAS**, the Shareholders have arranged to provide the funds necessary to acquire the Stock of a deceased Shareholder through life insurance; and

**WHEREAS**, the Shareholders desire to be assured of a market for their shares and for the continuity of management of the

Corporation in the event of death, disability, retirement, or termination of a Shareholder, and in the event of a transfer by operation of law.

**THEREFORE**, in consideration of the mutual promises and covenants contained herein and other valuable consideration which the parties acknowledge receipt of, it is agreed as follows:

1. <u>Restrictions on Shares</u>. During the term of this Agreement, no Shareholder shall sell, transfer or otherwise dispose of any shares of Stock which he now owns or which he may acquire in the future unless he shall have complied with the provisions of this Agreement. This Agreement shall not prevent the Shareholders from encumbering, assigning, or otherwise setting over any shares of the Stock of the Corporation as security for a loan or similar creation of debt.

2. <u>Sale of Stock During Lifetime - Resignation or General Transfer</u>.

    a. <u>Notice</u>. If any Shareholder desires to sell, transfer or otherwise dispose of all or any portion of his or her Stock after his or her Resignation or as a General Transfer, he or she shall give written notification of the proposed transfer to the Corporation and to the other Shareholders. The notice must set forth the name of the proposed transferee, the number of shares of Stock to be transferred, the price per share and all other terms and conditions of the proposed transfer.

    b. <u>Right of First Refusal</u>. Upon receipt of a notice of such a proposed transfer of Stock, the Corporation shall have the exclusive right and option for a period of sixty (60) days to purchase the Stock. The Corporation shall exercise its option by giving written notice within the sixty (60) day period to the Shareholder desiring to transfer his Stock (the "Offering Shareholder"). If the

2

Corporation exercises this purchase option, the
Corporation shall additionally purchase Stock from the
remaining Shareholders in such amounts that will equalize
each remaining Shareholder's Stock ownership after such
purchase. The purchase price and the terms of the
purchase for any Stock purchased pursuant to the
provisions of this paragraph shall be equal to the value
as determined for in Paragraph 9 of this Agreement.

c.   <u>Transfer of Stock After Lapse of Option</u>.  In the event
that the Corporation does not elect to purchase the
Stock, the Offering Shareholder shall have the right to
transfer the Stock to the prospective transferee named in
the written notice given to the Corporation and to the
other Shareholders. This transfer may be made only in
strict accordance with the terms stated in the notice.
Any Stock transferred by the Offering Shareholder to the
prospective transferee named in the written notice shall
be subject to the terms of this Agreement, and the person
or entity receiving such Stock and any subsequent
transferee shall be subject to and bound by this
Agreement in the same manner and with the same effect as
the Offering Shareholder would be bound had he not
transferred his Stock.  No transfer of Stock shall be
effective until the transferee signs this Agreement.  If
the Offering Shareholder fails to sell the Stock within
sixty (60) days following the expiration of the
Corporation's option to purchase the Stock, the Stock
shall again become subject to all of the restrictions of
this Agreement.

3.   <u>**Sale of Stock During Lifetime - Involuntary Transfer**</u>.  If any
of the shares of Stock owned by any Shareholder are
transferred by operation of law to any person other than the

Corporation for any reason other than death (such as, but not limited to, a Shareholder's trustee in bankruptcy, a purchaser at any creditors' or court sale or the guardian or conservator of an incompetent Shareholder), the Corporation shall have the exclusive right to purchase the shares of stock so transferred (the "Transferred Stock") within sixty (60) days of the date upon which it first obtained actual notice of the transfer. If the Corporation exercises this purchase option, the Corporation shall additionally purchase Stock from the remaining Shareholders in such amounts that will equalize each remaining Shareholder's Stock ownership after such purchase. The purchase price and the terms of the purchase for any Stock purchased pursuant to the provisions of this paragraph shall be equal to the value as determined for in Paragraph 9 of this Agreement. Should the Corporation not desire to acquire the Stock, then the Shareholder may dispose of his Stock as he so desires, subject to other terms and conditions of this Agreement.

4. **Sale of Stock During Lifetime - Termination for Cause**. Because of the importance of full-time employment to the parties to this Agreement, if any Shareholder who is a party to this Agreement should be terminated from the service of the Corporation for cause, hereinafter referred to as "Termination for Cause", then, within sixty (60) days of said termination, said Shareholder shall make his Stock available for purchase by the Corporation. The Corporation shall have the exclusive right to acquire said Stock, and the Corporation shall have the right to acquire said Stock by giving notice of acceptance to approve said Stock purchase within sixty (60) days from the date of Termination For Cause. If the Corporation exercises this purchase option, the Corporation shall additionally purchase Stock from the remaining Shareholders in

4

such amounts that will equalize each remaining Shareholder's Stock ownership after such purchase. The purchase price and the terms of the purchase for any Stock purchased pursuant to the provisions of this paragraph shall be equal to the value as determined for in Paragraph 9 of this Agreement. Should the Corporation not desire to acquire the Stock, then the Shareholder may dispose of his Stock as he so desires, subject to other terms and conditions of this Agreement.

5.  **Sale of Stock During Lifetime - Disability**. Upon the disability of a Shareholder, hereinafter referred to as "Disabled" or "Disability", the Corporation shall have the exclusive right and option for a period of sixty (60) days from the date the Corporation first obtained actual notice of such event to purchase all, or a portion of, the Stock owned by the Disabled Shareholder. If the Corporation exercises this purchase option, the Corporation shall additionally purchase Stock from the remaining Shareholders in such amounts that will equalize each remaining Shareholder's Stock ownership after such purchase. The purchase price and the terms of the purchase for any Stock purchased pursuant to the provisions of this paragraph shall be equal to the value as determined for in Paragraph 9 of this Agreement. Should the Corporation not desire to acquire the Stock, then the Shareholder may dispose of his Stock as he so desires, subject to other terms and conditions of this Agreement.

6.  **Sale of Stock During Lifetime - Retirement**. Upon the retirement of a Shareholder, hereinafter referred to as "Retirement" or "Retired", the Corporation shall have the exclusive right and option for a period of sixty (60) days from the date the Corporation first obtained actual notice of such event to purchase all, or a portion of, the Stock owned by the retiring Shareholder. If the Corporation exercises

this purchase option, the Corporation shall additionally purchase Stock from certain remaining Shareholders in such amounts that will equalize each remaining Shareholder's Stock ownership after such purchase. The purchase price and the terms of the purchase for any Stock purchased pursuant to the provisions of this paragraph shall be equal to the value as determined for in Paragraph 9 of this Agreement. Should the Corporation not desire to acquire the Stock, then the Shareholder may dispose of his Stock as he so desires, subject to other terms and conditions of this Agreement.

7. **Death of a Shareholder**. Upon the death of a Shareholder, the Corporation shall purchase from the Estate of the deceased Shareholder and the personal representative of the deceased Shareholder's estate shall sell the deceased Shareholder's Stock in the Corporation. The Corporation shall additionally purchase Stock from certain surviving Shareholders in such amounts that will equalize each surviving Shareholder's Stock ownership after such purchase. The purchase price and the terms of the purchase for any Stock purchased pursuant to the provisions of this paragraph shall be equal to the value as determined in Paragraph 9 of this Agreement.

8. **Insurance**. The Trustee will purchase policies of life insurance as follows:

   a. A policy on the life of Michael S. Sutter, naming the Trustee as beneficiary, in the amount of Five Hundred Thousand Dollars($500,000.00).

   b. A policy on the life of Donald W. Gaza, naming the Trustee as beneficiary, in the amount of Five Hundred Thousand Dollars($500,000.00).

   c. A policy on the life of Jerri L. Sutter, naming the Trustee as beneficiary, in the amount of Five Hundred Thousand Dollars($500,000.00).

6

d.   A policy on the life of Polly A. Gaza, naming the Trustee as beneficiary, in the amount of Five Hundred Thousand Dollars($500,000.00).

The policies procured, hereinafter referred to as the "Policies," shall be listed on Schedule "A" attached hereto and made a part hereof and all proceeds received thereunder by the Trustee, as a result of the death of any Shareholder, shall be delivered by the Trustee to the Corporation in an amount equal to the purchase price of the Stock, as such purchase price is determined by Paragraph 9 of this Agreement. The Corporation shall apply said proceeds toward the purchase price of the Stock in accordance with the terms of this Agreement. The Trustee shall pay all premiums due on the policies taken out hereunder, or the Corporation may make such payments on the Trustee's behalf.   At any time, any Shareholder or the Corporation may cause the Trustee to deposit proof of payment of premiums with the Corporation within fifteen (15) days written notice to the Trustee.

9.  **Purchase Price and Terms**.

a.  Value of Corporation.

For the purposes of this Agreement, the Corporation shall be valued as of the date of this agreement, at a value of Twenty Thousand Dollars ($20,000.00), per each share of stock. This purchase price has been agreed upon by the Shareholders and the Corporation as representing the fair value of the stock of the Corporation. Within ninety (90) days following the end of each fiscal year, the Shareholders and the Corporation agree to redetermine the value of each share of Stock and shall indicate such value by endorsement on Schedule "B" attached hereto and made a part hereof. If, for any reason, the Shareholders and Corporation fail to redetermine the value for

7

a particular year, the last previously stipulated value shall control.

b.  <u>Transfer by Resignation, General Transfer, Involuntary Transfer and/or Termination for Cause</u>.

If a transfer of Stock is initiated by the resignation of a Shareholder, General Transfer, involuntary transfer or Termination For Cause, and if the Corporation should exercise its right to acquire such Stock pursuant to Paragraph 2, Paragraph 3, or Paragraph 4 of this Agreement, then the Corporation shall acquire such Stock at a purchase price equal to fifty percent (50%) of the value of the Stock, based upon the value of the Corporation determined in accordance with subparagraph 9(a) of this Agreement. Payment of the purchase price shall be made over a period of six (6) years in equal, semi-annual payments carrying an interest rate of seven percent (7%) per annum. Any unpaid balance of the purchase price shall be evidenced by a negotiable promissory note made and endorsed by the Corporation, made payable to the transferring Shareholder.

c.  <u>Transfer Due to Disability or Retirement</u>.

If a transfer of Stock is initiated by the Disability or Retirement of a Shareholder, and if the Corporation should exercise its right to acquire such Stock pursuant to Paragraph 5 or Paragraph 6 of this Agreement, then the Corporation shall acquire such Stock at a purchase price equal to one hundred percent (100%) of the value of the Stock, based upon the value of the Corporation determined in accordance with subparagraph 9(a) of this Agreement. Payment of the purchase price in case of disability or retirement shall be made within thirty (30) days of the Corporation's election to purchase the Stock with the initial payment of at least ten percent (10%) of the purchase price and the balance remaining to be paid over a six

8

(6) year period in equal monthly installments, at a rate of interest of seven percent (7%) per annum. Any unpaid balance of the purchase price shall be evidenced by a negotiable promissory note made and endorsed by the Corporation, made payable to the Disabled or Retired Shareholder.

d.  Transfer Upon the Death of a Shareholder.

    i.   If a transfer of Stock is initiated by the death of a Shareholder, then the Corporation shall acquire the Stock of the deceased Shareholder at a purchase price equal to one hundred percent (100%) of the value of the Stock, based upon the value of the Corporation determined in accordance with subparagraph 9(a).

Upon the death of a Shareholder, the Trustee shall:

    ii   Make claim for, and collect the proceeds of the life insurance policy issued on the life of the deceased Shareholder within sixty (60) days of the death of a Shareholder.

    iii. Deliver to the Corporation the purchase price of the Stock of the deceased Shareholder as determined by subparagraph 9(a).

    iv.  The Corporation shall then pay to the personal representative of the Estate of the deceased Shareholder the purchase price for the Stock of the deceased Shareholder, within thirty (30) days of the Corporation's receipt of the same from the Trustee.

    v.   The unpaid balance of the purchase price, if any, shall be paid in forty-eight (48) consecutive equal monthly payments, beginning two (2) months after the insurance proceeds have been paid by the

9

Corporation to the personal representative of the deceased Shareholder; provided the Corporation has simultaneously received from the Estate of such deceased Shareholder, all of the shares herein required to be sold by such Estate to Corporation. The unpaid balance of the purchase price shall be evidenced by a negotiable promissory note, made by the Corporation to the order of the Estate of the decedent, with interest at the rate of seven percent (7%) per annum.

e.   Equalizing Purchases.

In the event the Corporation elects to purchase the Stock of a Shareholder pursuant to Paragraph 2, Paragraph 3, Paragraph 4, Paragraph 5, Paragraph 6, or Paragraph 7 of this Agreement, the Corporation shall additionally purchase Stock from certain remaining Shareholders in such amounts that will equalize each remaining Shareholder's Stock ownership after such purchase. Except in the event of death, the Corporation shall acquire such Stock at a purchase price equal to one hundred percent (100%) of the value of the Stock, based upon the value of the Corporation determined in accordance with subparagraph 9(a) of this Agreement. Payment of the purchase price shall be made within thirty (30) days of the Corporation's election to purchase the Stock with the initial payment of at least ten percent (10%) of the purchase price and the balance remaining to be paid over a six (6) year period in equal monthly installments, at a rate of interest of seven percent (7%) per annum. Any unpaid balance of the purchase price shall be evidenced by a negotiable promissory note made and endorsed by the Corporation, made payable to the Shareholder selling Stock. In the event of the death of a Shareholder and the Corporation's subsequent equalizing purchases of Stock from

10

remaining Shareholders, the purchase price and terms of payment of such Stock shall be the same as described in subparagraph 9(d) of this Agreement.

10. **Evidence of Indebtedness**. Whenever an election or requirement is made for the purchase of Stock as provided herein and a balance is to be paid over a period of years, said balance shall be represented by a Promissory Note. Said Promissory Note shall provide the right of prepayment without penalty and a thirty (30) day grace period for payment of any installment without being found in default. Said Promissory Note shall also provide that if payment is not made within the thirty (30) day grace period, and said note is found in default, then the holder thereof shall be entitled to reasonable attorney fees for collection. Such note shall further provide that, upon the default of any payment of principal or interest, the entire unpaid balance shall become due and payable immediately, and shall give the maker thereof the option of prepayment in whole or in part at any time without penalty.

11. **Delivery of Stock**. At such time as the Corporation shall elect to purchase the Stock in accordance with any terms and conditions provided herein, then such Stock shall be held by the Corporation in escrow. The holder of the Stock subject to transfer shall not vote on the question of whether the Corporation shall exercise any purchase option granted pursuant to this Agreement at any meeting of the Shareholders or directors of the Corporation called for the purpose of determining whether to exercise such option. Upon full payment of the value of such Stock, the Corporation shall then retain such Stock as treasury stock, or, in the event of a third-party purchaser, deliver such stock to the purchasing party. The selling Shareholder shall be entitled to return of such Stock if payment has not been made as provided herein.

11

12. **Endorsement on Stock Certificates**. Upon the execution of this Agreement, the certificates of Stock subject hereto shall be surrendered to the Corporation and endorsed as follows:

> "This certificate is transferable only upon compliance with the provisions of an agreement dated the _____ day of _____, 2000, among Northern Plant Services, Ltd., the shareholders of Northern Plant Services, Ltd., and Northern Plant Services, LLC, a copy of which is on file in the Office of the Secretary of the Corporation."

After endorsement, the certificates shall be returned to the Shareholders who shall, subject to the terms of this Agreement, be entitled to exercise all rights of ownership of such Stock. All Stock hereafter issued to the Shareholders shall bear the same endorsement.

13. **Term**. This Agreement shall terminate upon the occurrence of any of the following events:

a. Cessation of the Corporation's business.

b. Bankruptcy, receivership, or dissolution of the Corporation.

c. The voluntary agreement of all parties who are then bound by the terms hereof.

14. **Purchase of Insurance Policies on Termination**. Each Shareholder shall have the right, within thirty (30) days after termination of this Agreement, to purchase from the Trustee any and all policies of insurance, as listed on Schedule "A", on his life at a price equal to the cash surrender value, if any, of the policies on the date of termination of this Agreement, less any existing indebtedness charged against such policy, plus the proportionate part of the gross premium last paid before the date of the offer of sale of the Stock which covers the period extending beyond that date. Upon receipt of the purchase price, if any, the Trustee shall deliver the policies to the purchasing Shareholder and shall execute any necessary instruments of

12

transfer. The insured shall have no further rights in any policies not purchased within the above thirty (30) day period.

15. **Definitions**. For purposes of this Agreement, the following terms shall have the meanings as set forth:

a. "Disabled" or "Disability" shall mean the complete inability of a Shareholder to engage in the practice of his employment with the Corporation for a period of twelve (12) months.

b. "Retirement" or "Retired" shall mean the withdrawal of a Shareholder from the active practice of his employment with the Corporation after attaining the age of sixty-five (65) years, by his own volition with the intention of not seeking active full-time employment with any other entity, Corporation or concern, or self-employment.

c. "Termination for Cause" shall include but shall not be limited to any of the following reasons:

i. Failure to perform duties, faithfully, diligently, competently and to the best of the employee's ability, other than for reasons such as physical disability or incapacity.

ii. Appearing at work or meeting with customers or clients when intoxicated from liquor or drugs other than those drugs prescribed by a doctor.

iii. Disclosing of trade secrets and customer lists to competitors.

iv. Absences from work under unauthorized non-medical leave other than for vacation in excess of eight (8) calendar days per month.

v. Insubordination or persistent disregard to the rules and procedures of the Corporation regarding sales and supervision or continually causing

disharmony among other employees of the Corporation.

No warning need be given to any employee for proper cause other than unsatisfactory performance of work. In the event that it is determined that the termination was improper, the employee shall be reinstated and fully compensated for the time loss resulting from termination and shall retain such Stock that was sold.

d.  "Transfer" shall mean the actual or beneficial change in ownership of Shares.

e.  "Resignation" shall mean the withdrawal of a Shareholder from the active practice of his employment with the Corporation by his own volition.

f.  "General Transfer" shall mean the actual or beneficial change in ownership of Stock by a Shareholder by his own volition and for reasons other than Retirement.

18.  **Benefits**. This Agreement shall be binding upon the parties, their heirs, legal representatives, successors, and assigns.

IN WITNESS WHEREOF, the parties have signed this Agreement on the date first written above.

Corporation:

Northern Plant Services, Ltd.
an Indiana Corporation

By:  Donald W. Gaza
Its: President

ATTEST:

By:  Jerri L. Sutter
Its: Secretary

Trustee:

Northern Plant Services, LLC,
an Indiana limited liability
company

By:  Donald W. Gaza
Its: Member

By:  Polly A. Gaza
Its: Member

By:  Michael S. Sutter
Its: Member

By:  Jerri I. Sutter
Its: Member

(Signatures continued on page 16)

15

Shareholders:

_____
Donald W. Gaza, Shareholder

_____
Polly A. Gaza, Shareholder

_____
Michael S. Sutter, Shareholder

_____
Jerri L. Sutter, Shareholder

SCHEDULE "A"
Listing of Life Insurance

Description:

## SCHEDULE "B"
### Agreed Value of Share of Stock


Date: _____, _____


Value of One (1) Share of Stock:  $_____

_____
Donald W. Gaza, Shareholder

_____
Polly A. Gaza, Shareholder

_____
Michael S. Sutter, Shareholder

_____
Jerri L. Sutter, Shareholder


Northern Plant Services, Ltd.
an Indiana Corporation

_____
By:   Donald W. Gaza
Its:   President

ATTEST:

_____
By:   Jerri L. Sutter
Its:   Secretary

# EXHIBIT B



WWW.KRIEGDEVAULT.COM

April 6, 2022

**J. Brian Hittinger**
**Direct Dial: (219) 227-6114**
**E-mail: jbhittinger@kdlegal.com**

Via Certified Mail/Return Receipt Requested
Via First Class Mail
Via Email – polly@chicagorawfood.com

Polly A. Gaza
3 Preserve Way
New Buffalo, MI 49117

RE:     Notice of Acceptance of Right to Acquire Stock

Dear Polly:

As you are aware, our firm serves as corporate counsel for Northern Plant Services, Ltd. ("Corporation").

On the 3rd day of March, 2022, the Shareholders and Directors of the Corporation terminated you as a Director, Officer and Employee of the Corporation, all for cause. As a result of such termination, pursuant to the Corporation's Buy-Sell Agreement ("Buy-Sell"), you are to make your stock available for purchase by the Corporation, where the Corporation has the exclusive right to acquire said stock in exchange for a promissory note from the Corporation in the amount of the purchase price of Two Hundred Fifty Thousand Dollars ($250,000.00), payable over a period of six (6) years in equal, semi-annual payments, carrying an interest rate of seven percent (7%) per annum.

This correspondence shall serve as notice of the Corporation's exercise of its right to acquire all of your stock in the Corporation. As a result of this notice, your stock in the Corporation is now held in escrow by the Corporation, pending your formal transfer of the stock to the Corporation in exchange for said promissory note. Please notify my office as to the earliest date possible that you are available to further close this transaction. Upon formally closing this transaction you shall have the right for thirty (30) days to purchase any insurance policies insuring your life as owned by the Corporation or Northern Plant Services, LLC, all in accordance with the Buy-Sell.

I thank you for your assistance in this matter.

Very truly yours,

J. Brian Hittinger

JBH:bh
cc:     Michael S. Sutter
        Jerri L. Sutter
        Attorney Colby Barkes

KD_13843803_1.docx

8001 BROADWAY, SUITE 400, MERRILLVILLE, IN 46410-5552 T 219.227.6100 F 219.227.6101