UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| POLLY GAZA,<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN PLANT SERVICES LTD, et al.,<br><br>Defendants. | Case No. 2:23-CV-318-GSL |

**OPINION AND ORDER**

This matter is before the Court on Plaintiff Polly Gaza's "Motion for Entry of Judgment on Joint and Several Liability, and Motion for an Award of Prejudgment Interest, Attorney's Fees, and Equitable Relief," filed on July 31, 2026 [DE 231]. The motion is fully briefed and ripe for judgment. [*See* DE 231–34; DE 239]. For the reasons stated below, Plaintiff's motion is **GRANTED IN PART, DENIED IN PART**.

**BACKGROUND**

Beginning on February 9, 2026, a four-day jury trial was held in this matter, wherein Plaintiff tried her claims for breach of contract and breach of fiduciary duty against Defendants Northern Plant Services (NPS), and Michael and Jerri Sutter (collectively, "the Sutters"). [*See* DE 214–16; DE 218].[1] On the final day of trial, the Court, *sua sponte*, dismissed Plaintiff's breach of fiduciary claim via directed verdict and presented the breach of contract claim to the jury. [*See* DE 218]. Prior to the verdict being rendered, the Court informed the parties that in the chance that the Sutters are found to have improperly terminated Plaintiff, the Court would have

[1] Count 1 of Plaintiff's amended complaint, which sought declaratory relief against NPS, remained active pending the outcome of the trial.

to take the verdict under advisement to assess the ultimate question of who would be liable for any damages award. [*See id.*]. The parties agreed and acknowledged that post-trial proceedings may be required to assess the issue of damages liability. [*Id.*]. The jury then returned a favorable verdict for Plaintiff on the breach of contract claim against all three named defendants and awarded damages in the amount of $550,000. [DE 218; DE 220]. The parties thereafter engaged in three rounds of settlement negotiations before Magistrate Judge Martin, but were ultimately unsuccessful. [DE 223–26].

On July 8, 2026, the Court held a status conference to assess how the parties wished to proceed with Plaintiff's declaratory action and to determine the issue of damages liability. [DE 230]. Following that discussion, the Court ordered post-trial briefing on Plaintiff's proposed damages and requested relief. [*Id.*]. Plaintiff filed her brief on July 31, 2026, NPS and the Sutters filed their respective responses on August 31, 2026, and Plaintiff filed her reply on September 1, 2026. [DE 231–34]. The Sutters thereafter filed a sur-reply on September 11, 2026. [DE 239].[2] The motion is now ripe and ready for ruling.

**LEGAL STANDARD**

This case is brought pursuant to the Court's diversity jurisdiction. Where a case is brought to federal court on diversity jurisdiction, the court applies federal procedural law and state substantive law. *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010). "When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits." *Fednav Intern. Ltd. v. Continental Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010) (quoting *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746 (7th Cir. 2008)).

[2] At the July 8 status conference, the Court permitted the named defendants to file a sur-reply if one was necessary. [DE 230].

Here, the Court applies the damages rules of Indiana—the state whose law governs the substantive issues in the case. *See CCP Golden/ 7470 LLC v. Breslin*, 161 F.4th 461, 470 (7th Cir. 2025); *see also Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008) ("[I]n a diversity suit, the damages rules of the state whose law governs the substantive issues in the case bind the federal court; damages law is substantive law."). Under Indiana law, the plaintiff carries the burden of pleading and proving damages with reasonable certainty. *See Ent. USA, Inc. v. Moorhead Commc'ns, Inc.*, 897 F.3d 786, 792 (7th Cir. 2018); *Derr Enters. v. Union City Ind. Props., LLC*, 253 N.E.3d 1129, 1135 (Ind. Ct. App. 2025). Damages related to prejudgment interest, as well as attorney's fees, are similarly assessed under Indiana law. *See Leaf Funding, Inc. v. Brogan Pharms., Inc.*, 642 F. Supp. 2d 844, 856 (N.D. Ind. 2009) (citing *Travelers Ins. Co. v. Transp. Ins. Co.*, 846 F.2d 1048, 1051 (7th Cir. 1988); *Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008)).

In contrast, federal law governs the award of post-judgment interest in a diversity case. *See Travelers*, 846 F.2d at 1053 (reversing district court's application of Indiana's post-judgment interest statute in a diversity case and instead requiring application of 28 U.S.C. § 1961(a)). Moreover, where a federal court is asked to enter declaratory relief, it must do so under the Federal Declaratory Judgment Act. *Bell v. PNC Bank Nat'l Ass'n*, 717 F. Supp. 3d 792, 795 (E.D. Wis. 2024) (citing 28 U.S.C. § 2201; *Med. Assurance Co. v. Hellman*, 610 F.3d 371, 377 (7th Cir. 2010)). This statute is a procedural tool, not a source of substantive law. *See Hellman*, 610 F.3d at 377.

## DISCUSSION

In her post-trial motion, Plaintiff seeks the following relief: (1) joint and several liability against the three named defendants for the $550,000 damages award; (2) prejudgment and post-

judgment interest; (3) recovery of reasonable attorney's fees; and (4) reinstatement of her employment and the restoration of her shares in NPS. [DE 231 at 1]. The Court will address each request in the order presented in the briefing.

## I. Joint and Several Liability for the $550,000 Damages Award

The first issue to discuss is whether NPS and the Sutters should be held jointly and severally liable for the $550,000 damages award. Plaintiff argues that joint and several liability should apply, whereas both NPS and the Sutters contend that the only party that should be on the hook for Plaintiff's damages is NPS.

Before delving into the merits of the parties' arguments though, the Court notes, as the parties correctly point out, that this is not a case in which Indiana's Comparative Fault Act applies. Indiana's Comparative Fault Act governs actions "based on fault"—that is, "any act or omission that is negligent, willful, wanton, reckless, or intentional toward the person or property of others," *see Schultz v. S.P. Real Est. LLC*, 273 N.E.3d 530, 534 (Ind. Ct. App. 2025) (quoting Ind. Code § 34-6-2.1-68(b))—and was passed in large part to "abolish the rule that contributory negligence constituted a complete bar to recovery in most suits for negligence," *Ind. Dep't of Ins. v. Everhart*, 960 N.E.2d 129, 138 (Ind. 2012); *see* Ind. Code §§ 34-51-2-1 to -19. The Act requires a jury to allocate a percentage of responsibility to each defendant who contributed to the plaintiff's injuries, whereby each defendant is responsible for paying only his proportional share. *See Everhart*, 960 N.E.2d at 138 (citing Ind. Code §§ 34-51-2-7, -8). Because of this, the Act effectively abrogates the common law rule of joint and several liability: the principle that two or more co-defendants constitute joint tortfeasors where their independent negligent conduct cause the plaintiff some indivisible harm. *Id.* Under a theory of joint and several liability, each

defendant whose acts contributed to a plaintiff's harm is liable for the entire amount of damages. *See Shelton v. Kroger Ltd. P'ship I*, 58 N.E.3d 229, 233 (Ind. Ct. App. 2016), *trans. denied*.

Importantly, though, the Act only abrogates the common law in suits "to which the Act applies." *Id.* Certain types of suits, such as those for medical malpractice, claims against government entities and public officials, and intentional torts, are statutorily exempt, and thus subject to the common law principle of joint and several liability. *See* Ind. Code §§ 34-51-2-1, -2, -10; *Dallas v. Cessna*, 968 N.E.2d 291, 298 (Ind. Ct. App. 2012). Moreover, for purposes of this action, it is also understood that "Indiana does not recognize comparative causation in breach of contract claims." *Lifeline Youth & Fam. Servs., Inc. v. Installed Bldg. Prods., Inc.*, 996 N.E.2d 808, 814 (Ind. Ct. App. 2013) (quoting *Parke State Bank v. Akers*, 659 N.E.2d 1031, 1035 (Ind. 1995)). Because this action was tried exclusively before the jury as a breach of contract claim, [*see* DE 231 at 3], comparative fault does not apply.

Having addressed that point, the Court moves to the merits of Plaintiff's request for joint and several liability. Plaintiff raises a myriad of arguments as to why the Sutters, alongside NPS, should be liable for the damages award. But for a few reasons, the Court is not persuaded that joint and several liability is appropriate under these circumstances.

### A. Plaintiff Cannot Pursue Damages Against the Sutters in Their Roles as NPS Shareholders/Officers/Directors, Nor Can She Pursue Damages Against Them Personally.

First and foremost, Plaintiff cannot pursue damages against the Sutters in their roles as either NPS shareholders or officers/directors, nor can she seek damages from them personally. The Court finds *Escobedo v. BHM Health Associates, Incorporated.*, 818 N.E.2d 930 (Ind. 2004), a decision involving claims against corporate shareholders for unpaid wages, to be particularly instructive on this issue. There, former employees of BHM Health Associates

(BHM) brought claims against the company and two 50% equal shareholders, officers, and directors of BHM for unpaid wages, statutory penalties, and union dues. *Id.* at 932. In affirming the trial court's dismissal of claims against the individual shareholders, the Court first reiterated the "bedrock nature of the principle of limited shareholder liability" previously discussed in *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994) (later codified under Indiana Code Section 23-1-26-3(b)), which explained that "corporate shareholders sustain liability for corporate acts only to the extent of their investment and are not held personally liable for the acts attributable to the corporation." *Id.* at 932 (quoting *Aronson*, 644 N.E.2d at 867). On that end, the Court then found that the plaintiffs' sole theory of recovery was to "pierce the corporate veil" of BHM and its shareholders, but that insufficient evidence was ultimately presented under the relevant standard to succeed on such a theory. *Id.* at 935.

Here, *Escobedo* and *Aronson* both make clear that Plaintiff cannot seek damages against the Sutters as shareholders or directors/officers of NPS. And like the plaintiffs in *Escobedo*, Plaintiff's avenues for collection of damages against the Sutters are essentially limited to "piercing the corporate veil" or establishing fraud, neither of which she pled or proved. [*See* DE 95 (bringing only claims for wrongful termination, breach of contract, and breach of fiduciary duty against the Sutters)]. The Sutters previously pointed out Plaintiff's failure to plead these theories in their brief addressing the constitution of "time loss" under the Buy-Sell Agreement, [*see* DE 211 at 4 n.2], and the point was likewise noted by NPS at trial, [*see* DE 216]. Plaintiff did not refute this assertion, instead stating that such matters would be handled in post-judgment proceedings. [*See id.*]. Her failure to raise corporate veil piercing or fraud at any time prior to trial may therefore effectively preclude the issue's consideration at this time.[3] But Plaintiff's

---

[3] The Indiana Court of Appeals recently held that "piercing the corporate veil is an equitable remedy rather than an independent cause of action." *Elpers Bros. Constr. & Supply, Inc. v. Smith*, 230 N.E.3d 920, 930 (Ind. Ct. App.

failure to plead notwithstanding, she has presented no evidence suggesting that either theory could be sustained.

Piercing the corporate veil is an equitable doctrine which, although reluctantly applied, is designed to "protect innocent third parties from fraud or injustice." *Reed v. Reid*, 980 N.E.2d 277, 301 (Ind. 2012) (quoting *Aronson*, 644 N.E.2d at 867). Where a corporation is functioning as a mere instrumentality of an individual, it may be appropriate to disregard the corporate form and pierce the veil. *Id.*; *see Watters v. Cole*, 280 N.E.3d 299, 308 (Ind. Ct. App. 2026) (internal quotation marks removed) ("The remedy of piercing the corporate veil provides a means for a complainant to reach a second corporation or individual upon a claim that otherwise would have existed only against the first corporation."). "The propriety of piercing the corporate veil is highly dependent of the equities of the situation, and the inquiry tends to be highly fact-driven." *Reed*, 980 N.E.2d at 301 (quoting William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.10 at 55 (2012 supp.)). The party seeking to pierce the corporate veil must demonstrate by a preponderance of the evidence that "the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice." *Id.* (quoting *Aronson*, 644 N.E.2d at 867); *see Escobedo*, 818 N.E.2d at 933.

"While no one talismanic fact will justify with impunity piercing the corporate veil, a careful review of the entire relationship between various corporate entities, their directors and officers may reveal that such an equitable action is warranted." *Reed*, 980 N.E.2d at 301 (quoting

---

2024), *trans. denied*. The *Elpers* court, however, was addressing the corporate alter ego theory, a "subset" of piercing the corporate veil which holds one corporation liable for the actions of another. *See id.*; *Blackwell v. Superior Safe Rooms LLC*, 174 N.E.3d 1082, 1093 (Ind. Ct. App. 2021), *trans. denied*. That theory is separate from a shareholder masquerading behind a corporate identity to avoid personal liability, which is what would need to be proven here. It is thus unclear whether the court's holding applies to piercing the corporate veil broadly, or whether it is limited to the corporate alter ego theory. Regardless, and as explained above, Plaintiff cannot succeed on a corporate veil piercing theory even if it not precluded by the failure to plead it.

*Stacey-Rand, Inc. v. J.J. Holman, Inc.*, 527 N.E.2d 726, 728 (Ind. Ct. App. 1988)). Several guideposts are considered when determining whether a shareholder, officer, or director can be liable for corporate acts, including: (1) undercapitalization of the corporation; (2) the absence of corporate records; (3) fraudulent representations by corporate shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; and (8) other acts or conduct ignoring, controlling, or manipulating the corporate form. *Id.* (citing *Aronson*, 644 N.E.2d at 867).

Separately, a claim for fraud may reach the same result, as it is "well-settled that a corporate officer cannot escape liability for fraud by claiming that he acted on behalf of the corporation when that corporate officer personally participated in the fraud." *See LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co.*, 722 F. Supp. 2d 1015, 1031 (N.D. Ind. 2010) (quoting *Gable v. Curtis*, 673 N.E.2d 805, 809 (Ind. Ct. App. 1996)). To prove such a claim, a plaintiff must show the following: (1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the plaintiff, and (6) which proximately caused the plaintiff harm. *BSA Constr. LLC v. Johnson*, 54 N.E.3d 1026, 1031 (Ind. Ct. App. 2016)*, trans. denied*.

Notably, Plaintiff presented no evidence whatsoever as to any factor or element under either of these theories, nor does she contest this in her briefing. Instead, Plaintiff attempts to distinguish *Escobedo* and argue that both theories are irrelevant when dealing with signatories to a contract. [DE 234 at 7–8]. According to Plaintiff, she is not in the position of the *Escobedo* employees because Michael and Jerri Sutter personally signed the Buy-Sell Agreement, and can

thus be held liable without needing to necessarily pierce the corporate veil. [*Id.* at 7]. But ironically, Plaintiff kills her own argument by next stating that "[the Sutters] personally signed the Buy-Sell Agreement, *in their own capacities as Shareholders*, the very instrument containing the remedial promise the jury found each of them breached." [*Id.* (emphasis added) (citing DE 231-1; DE 233 at 3)]. As explained above, this is the very premise that *Escobedo* and *Aronson* stand for: shareholders cannot be held liable for corporate acts absent proof of fraud or injustice.

Further, the Sutters and NPS argue at length that Plaintiff's termination, even if improper, was nonetheless conducted through corporate formalities—not by the Sutters personally—and was not conducted fraudulently. The Sutters' involvement in Plaintiff's termination was essentially reduced to their vote to terminate, as well as their execution of the termination, both of which were conducted as either shareholders or officers/directors operating on NPS' behalf. The Sutters did not pay Plaintiff's wages, nor were there signs of any intermingling funds and affairs. As the Sutters and NPS both note, Plaintiff's wages and fringe benefits were paid by NPS, and her termination effectuated by NPS. [*See* DE 232 at 6; DE 233 at 4 (citing DE 221, Exs. 10–11[4] (Letter and Notice of Annual Shareholders Meeting), 12 (Shareholder Meeting Minutes), 14 (NPS' Compensation of Officers); DE 217 at 9–10), 6]. Simply stated, there was no employment relationship between the Sutters and Plaintiff. [DE 232 at 3; DE 233 at 5].[5] As this demonstrates then, Plaintiff would have therefore needed to prove either fraud or piercing the

---

[4] The exhibit numbers listed here correspond to the Court's Exhibit and Witness list, contained at [DE 221].

[5] Each of the parties seemingly understood this point, but even if not, the Court conclusively addressed the lack of an employment relationship between the Sutters and Plaintiff at summary judgment. [DE 135 at 7 (citing DE 127 at 4 n.2) (granting the Sutters' motion for summary judgment on Plaintiff's wrongful termination claim)]. Moreover, there is no proof of any outside promises to compensate Plaintiff, such as by a promissory note. *See Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848, 855 (Ind. Ct. App. 2007) (citing *Campion v. Wynn*, 486 N.E.2d 543, 545–46 (Ind. Ct. App. 1985)) (where promissory note contained phrase "the undersigned (jointly and severally) promise(s) to pay," both a corporation and its officer were liable). Thus, any obligations the Sutters would owe Plaintiff would have had to come from the Buy-Sell Agreement.

corporate veil to reach the Sutters individually for their role in Plaintiff's termination. She did not do so.

Lastly, Plaintiff appears to argue that piercing the corporate veil is inapplicable to a breach of contract claim and that she need not have proved it to acquire damages against the Sutters. This, however, is far from true, as courts routinely address piercing the corporate veil in the context of, and in conjunction with, contractual breaches. *See, e.g.*, *Blackwell*, 174 N.E.3d at 1094 (reversing trial court's denial of plaintiff's motion to pierce the corporate veil in proceedings supplemental to breach of contract action against company); *Cont'l Cas. Co. v. Symons*, 817 F.3d 979, 997 (7th Cir. 2016) (affirming trial court's finding that company breached contract and that individual shareholders were personally liable after piercing the corporate veil); *Ziese & Sons Excavating, Inc. v. Boyer Constr. Corp.*, 965 N.E.2d 713, 721 (Ind. Ct. App. 2012) (reversing grant of summary judgment on breach of contract and decision to pierce the corporate veil); *Michiana Dairy Processors, LLC v. All Star Beverage, Inc.*, 744 F. Supp. 2d 790, 808 (N.D. Ind. 2010) (granting defendants' motion for summary judgment on issues of breach of contract and piercing the corporate veil where there was no underlying liability); *Keller Farms,* 722 F. Supp. 2d at 1031 (addressing whether a sole shareholder of company sued for breach of contract could be held personally liable under theory of piercing the corporate veil). The Court therefore finds this attempt to evade the doctrine, and the responsibility for failing to address it earlier in the proceedings, unpersuasive.

Plaintiff therefore cannot bypass the corporate veil to collect damages from the Sutters, either individually, as NPS shareholders, or as NPS officers/directors.

### B. The Buy-Sell Agreement Neither Requires Nor Supports the Application of Joint and Several Liability.

Plaintiff next argues that the language of the Buy-Sell Agreement supports the application of joint and several liability. [DE 234 at 4]. Plaintiff argues that because the Sutters personally signed the Buy-Sell Agreement, they are bound for any breaches of the agreement. [*Id.* at 5]. Plaintiff also refers to Paragraph 15(c), which she argues constitutes a bargained-for liquidated damages provision "reinforc[ing], rather than complicat[ing], joint and several liability among its signatories." [DE 234 at 4–5]. Both arguments, however, fail to demonstrate that the Buy-Sell Agreement necessitates the application of joint and several liability.[6]

Looking first to the Buy-Sell Agreement's language, Paragraph 15(c) defines what actions constitute a "termination for cause," and further provides that where a for-cause termination was made improperly, "the employee shall be reinstated and fully compensated for the time loss resulting from termination and shall retain such Stock that was sold." [*See* DE 231-1 at 13–14]. The provision does not explicitly specify *who* is responsible for compensating the terminated employee for time loss, or rather, *who* will reinstate Plaintiff's employment and stock. The Sutters, however, argue that when Paragraph 15(c) is read in conjunction with other provisions of the Buy-Sell Agreement, the answer is clear: NPS is the only party with the

[6] The Court's primary focus is on the language of the Buy-Sell Agreement itself. As to Plaintiff's liquidated damages argument, this fails for two reasons. First, Paragraph 15(c) is, by definition, not a liquidated damages provision because it does not provide for "the forfeiture of a stated sum of money without proof of damages." *Corvee, Inc. v. French*, 943 N.E.2d 844, 846 (Ind. Ct. App. 2011); *see also Time Warner Ent. Co., L.P. v. Whiteman*, 802 N.E.2d 886, 893 (Ind. 2004) ("The term 'liquidated damages' applies to a specific sum of money that has been expressly stipulated by the parties to a contract as the amount of damages to be recovered by one party for a breach of the agreement by the other, whether it exceeds or falls short of actual damages."). Paragraph 15(c) does not provide an explicit number to be paid, nor does it even define what "time loss" is, an omission of which required the Court to facilitate additional briefing immediately prior to trial to determine what damages Plaintiff would theoretically be entitled to under her breach of contract claim. [*See* DE 213 at 3 (citing DE 178 at 9–10; DE 207) (defining "time loss" as salary compensation, various company benefits, and bonuses)]. But second, even if it were a liquidated damages provision, this fact alone brings the Court no closer to determining who must provide it, as the provision itself does not specify. Rather, as explained accordingly, the answer must come from the surrounding language of the Buy-Sell Agreement.

contractual authority to provide any employment-related remedies available under the agreement.

Looking first to the preamble of the Buy-Sell Agreement, this portion of the agreement states that NPS is "closely held and [that] the Shareholders desire to promote their mutual interests and the interests of the Corporation by imposing certain restrictions and obligations on themselves, the Corporation, and the Stock[.]" [*Id.* at 1]. The preamble further states that "the Shareholders desire to guard against the introduction of ownership into the Corporation of other persons who may be either unwilling or unable to contribute to the success of the Corporation, by restricting the privilege of owning Stock," and that the Shareholders desire for the continued management of NPS in the event of any death, disability, termination, or retirement of a shareholder. [*Id.* at 1–2]. As the Sutters argue, the Buy-Sell Agreement thus essentially reflects the parties' base intention of controlling both who may participate in NPS' operation and how NPS stock is acquired/distributed. [DE 239 at 4].

To administer this intent, various provisions of the Buy-Sell Agreement provide that NPS—and not the individual shareholders—will retain the exclusive first right of refusal to acquire any stock, as well as the sole responsibility for purchasing any loose shares and paying out their value. [*Id.* at 4–5 (citing DE 231-1 at ¶¶ 2(b), 3, 5–7)]. Importantly, no such provision provides any of the individual shareholders with the right to acquire stock in their roles as shareholders.[7] The Buy-Sell Agreement further details the importance of working *for the*

[7] Notably, several of these provisions state that should NPS decide not to exercise its option to acquire the stock, then the shareholder whose stock is being transferred may dispense with the stock as they please, subject to the terms and conditions of the Buy-Sell Agreement. [*See* DE 231-1 at ¶¶ 2(b)–(c), 3, 5–7]. But none of these provisions state that the individual shareholders, in their capacity as shareholders, may acquire said stock. Rather, the transferor possesses the right to dictate who and how said stock is acquired through a written notice given to the potential transferee, as well as NPS and the other shareholders. [*See id.* at ¶ 2(c)]. The notice further provides that any transferee is bound by the same terms and conditions of the Buy-Sell Agreement, terms of which also do not provide the individual shareholders with financial authority to acquire the stock on their own. [*Id.*].

*corporation* and how the loss of employment will be handled, particularly where a shareholder is terminated "for cause." Specifically, Paragraph 4 states as follows:

> **Because of the importance of full-time employment to the parties to this Agreement, if any Shareholder who is a party to this Agreement should be terminated from the service of the Corporation for cause, hereinafter referred to as "Termination for Cause,"** then, within sixty (60) days of said termination, said Shareholder shall **make his Stock available for purchase by the <u>Corporation</u>. <u>The Corporation</u> shall have the exclusive right to acquire said Stock**, and the **<u>Corporation</u> shall have the right to acquire said Stock** by giving notice of acceptance to approve said Stock purchase within sixty (60) days from the date of Termination For Cause. If the **<u>Corporation</u>** exercises this purchase option, the **<u>Corporation</u>** shall additionally purchase Stock from the remaining Shareholders in such amounts that will equalize each remaining Shareholder's Stock ownership after such purchase. The purchase price and the terms of the purchase of any Stock purchased pursuant to the provisions of this paragraph shall be equal to the value as determined in Paragraph 9 of this Agreement. Should the **<u>Corporation</u>** not desire to acquire the Stock, then the Shareholder may dispose of his Stock as he so desires, subject to other terms and conditions of this Agreement.

[DE 239 at 5 (emphases in original) (quoting DE 231-1 at ⁋ 4)]. Finally, Paragraph 9(b), which governs the manner of transferring shares by resignation, general transfer, involuntary transfer, or termination for cause, states as follows:

> If a transfer of Stock is initiated by the resignation of a Shareholder, General Transfer, involuntary transfer or Termination For Cause, **and if the <u>Corporation</u> should exercise its right to acquire such Stock** pursuant to Paragraph 2, Paragraph 3, or Paragraph 4 of this Agreement, then **the <u>Corporation</u> shall acquire such Stock** at a purchase price equal to fifty percent (50%) of the value of the Stock, based upon the value of the Corporation determined in accordance with subparagraph 9(a) of this Agreement.

[DE 233 at 4–5 (emphases in original) (quoting DE 231-1 at ⁋ 9(b))].

The Sutters argue that these provisions show that the sole contractual authority for addressing financial matters pertaining to the termination of a shareholder's employment rests with NPS. [DE 239 at 6]. They further argue that this interpretation is even clearer when read in coordination with the "Definitions" section—particularly Paragraph 15(c)—which collectively indicate that the shareholders owe an employment commitment to NPS, not to other

shareholders, and that any remedy available to a shareholder must come from NPS. [*See* DE 231-1 at ⁋⁋ 15(a) (defining "Disability" as "the complete inability of a Shareholder to engage in the practice of *his employment with the Corporation* for a period of twelve (12) months"); (b) (defining "Retired" as "the withdrawal of a Shareholder from the active practice of *his employment with the Corporation* after attaining the age of sixty-five (65) years, by his own volition with the intention of not seeking active full-time employment with any other entity"); (c) (explaining that "[n]o warning need be given to any *employee* for proper cause other than unsatisfactory performance of work," and that upon an improper termination "*the employee* shall be reinstated and fully compensated for the time loss resulting from termination and shall retain such Stock that was sold"); (e) (defining "Resignation" as "the withdrawal of a Shareholder from the active practice of *his employment with the Corporation* by his own volition") (emphases added).

The Court agrees with this reading.[8] The Buy-Sell Agreement is clear on two points: (1) NPS has the exclusive authority over the initial acquisition and financing of equity within the company, and (2) a shareholder's employment obligations are between them and the company, not between them and other shareholders. Given this, it is reasonable to conclude that NPS is the only party authorized to compensate other parties to the agreement for employment-related matters. This is further supported when one reads Paragraph 15(c) in light of the Buy-Sell Agreement's other provisions regarding stock transfer, as Paragraph 15(c) describes corporate acts from which only NPS has the authority to perform. Stated differently, it would be nonsensical to conclude that the first and third stipulated remedies (reinstatement of employment

---

[8] Because the Court finds the Buy-Sell Agreement to be unambiguous regarding NPS' authority to compensate Plaintiff, the Court need not reach the Sutters' ambiguity argument. [*See* DE 239 at 8].

and retainment of shares) are performable only by NPS, yet conclude that the middle remedy (compensation of time loss) is performable by any other party to the agreement where no other party is under an obligation to compensate others.

The Court also agrees with the Sutters' point that because only NPS can effectuate a shareholder's termination, the Sutters did not assume the same contractual obligation as Plaintiff under the Buy-Sell Agreement when they moved to execute her termination on NPS' behalf. Plaintiff contends that because she, Michael Sutter, and Jerri Sutter each signed the agreement as "Shareholders," they automatically became co-obligors bound by the same contractual undertaking. [DE 234 at 5–6; *see also* DE 231-1 at 18 (signatures of Buy-Sell Agreement)].[9] But this fails to account for the method by which Plaintiff was terminated, as well as the fact that any corporate acts taken must be done by officers/directors operating on NPS' behalf, not by shareholders. As to the latter, while the Sutters may have signed the Buy-Sell Agreement as shareholders, they also signed the Buy-Sell Agreement in a separate capacity as officers and acted under their roles as President and Vice President, respectively, when they moved to terminate Plaintiff on NPS' behalf. [DE 217 at ⁋⁋ 4–7, 39].

[9] Plaintiff specifically relies on Section 289 of the Restatement (Second) of Contracts, which provides generally that multiple co-promisors bound by the same contractual obligations may be held jointly and severally liable for a breach, depending on the co-promisors undertaking. *See Restatement (Second) of Contracts* § 289(1) (1981) ("Where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance thereof, whether his duty is joint, several, or joint and several."). But here the Sutters did not act in their capacity as shareholders when they moved to execute Plaintiff's termination; they acted as officers/directors on behalf of NPS. What's more, the Court finds it noteworthy that only two cases have cited this provision, neither of which is applicable here. In *Thompson v. Wayne Smith Construction Company,* the Indiana Court of Appeals found the provision applicable to joint debtor liability in the context of a partnership, a distinct relationship to that of the parties under the Buy-Sell Agreement. 640 N.E.2d 408, 414 (Ind. Ct. App. 1994). Moreover, in *Brenner v. Greenberg*, the Northern District of Illinois cited the provision in conjunction with an Illinois statute rendering all joint obligations as joint and several obligations. 2011 WL 862224, at *3 (N.D. Ill. Mar. 10, 2011) (citing 735 ILCS 5/2-410; *Intervisual Comm'ns, Inc. v. Volkert*, 975 F. Supp. 1092, 1107 (N.D. Ill. 1997)). Indiana possesses no such statute. Thus, even if this provision were applicable, it is at best persuasive authority that the Court declines to impose here.

Specifically, a Notice of an Annual Shareholders' meeting was provided from counsel for NPS by NPS' directors. [DE 233 at 4 (citing DE 221, Ex. 10); *see also* DE 217 at ⁋ 36]. As the meeting minutes reflect, the meeting was called to order by Michael Sutter, through his capacity as NPS President, and a vote was held to terminate Plaintiff's employment with NPS "for cause." [DE 233 at 4 (citing DE 221, Ex. 12)]. The Sutters further moved, again on behalf of NPS, to execute a document entitled "Written Consent to Resolutions of Annual Directors' Meeting," which provided in relevant part:

> **[A]s a result of the termination of Polly A. Gaza as an employee of the Corporation,** it is in the **best interest of the Corporation to acquire all of Polly's stock in the Corporation, in accordance with the Corporation's Buy-Sell Agreement** as dated the 15th day of September 2000 ("Buy-Sell Agreement"), and the **Corporation hereby elects** to exercise its exclusive right to acquire said stock in accordance with said Buy-Sell Agreement, whereby **the above listed President and/or the Secretary of the Corporation are hereby authorized** to execute and deliver all necessary correspondence and other documents associated with or arising out of the purchase of Polly's stock in accordance with said Buy/Sell Agreement, **where such officers have full[] authority to do whatever is necessary to carry out the terms of the Buy-Sell Agreement, all in the name of and on behalf of the Corporation.**

[*Id.* at 5 (emphasis in original) (quoting DE 217 at ⁋ 47)]. Following Plaintiff's termination, Plaintiff was also issued a letter from NPS' counsel detailing NPS' election of its right to acquire Plaintiff's stock:

> On the 3rd day of March 2022, the Shareholders and Directors of the Corporation terminated you as a Director, Officer, and Employee of the Corporation, all for cause. As a result of such termination, pursuant to the Corporation's Buy-Sell Agreement ("Buy-Sell"), you are to make your stock available for purchase by the Corporation, where the Corporation has the exclusive right to acquire said stock in exchange for a promissory note from the Corporation in the amount of the purchase price of Two Hundred Fifty Thousand Dollars ($250,000.00), payable over a period of six (6) years in equal, semi-annual payments, carrying an interest rate of seven percent (7%) per annum.

[DE 217 at ⁋ 45]. Therefore, the Court is unconvinced that the Sutters acted in the same capacity as Plaintiff when they moved for her termination.

Finally, even if the Court disregarded the previous points and considered the Sutters' contractual undertaking as shareholders, the Buy-Sell Agreement still does not contain any unambiguous language rendering a joint and several obligation. *See Restatement (Second) of Contracts* § 289(2) (1981) ("Where two or more parties to a contract promise the same performance to the same promisee, they incur only a joint duty unless an intention is manifested to create several duties or joint and several duties.").

As a helpful comparison, the Court refers to *St. Paul Fire & Insurance Co. v. Schilli Transport Services Incorporated*, 672 F.3d 451 (7th Cir. 2012). There, the Seventh Circuit was tasked with determining whether an insurance policy's language was clear and unambiguous so as to render a joint and several obligation on the named insureds for a deductible payment. *Id.* at 456. At the center of the dispute was the meaning of the word "you" where the policy provided that "[y]ou agree to repay us up to this deductible amount for all damages caused by any one accident, as soon as we notify you of the judgment or settlement." *Id.* at 456–57. While the policy stated that "you, your and yours mean the insured named here, which is a CORPORATION," and then listed Schilli Transportation's name and address, below Schilli's name the policy further stated, "Insured Names Continued on Back," whereby eight additional companies were listed. *Id.* at 459. Relying on comparable decisions from the Indiana Court of Appeals and the First Circuit, the Seventh Circuit found that the manner in which the insureds were listed suggested that they *may* be considered jointly, but because no other provision explicitly mentions "joint and several liability," this alone was insufficient to create such an obligation. *Id.* at 462 (citing *Ind. Ins. Co. v. O.K. Transp., Inc.*, 587 N.E.2d 129 (Ind. Ct. App. 1992); *Over the Road Drivers, Inc. v. Transp. Ins. Co.*, 637 F.2d 816 (1st Cir. 1980)).

Here, the Buy-Sell Agreement contains no such provision specifying or mentioning "joint and several liability." And unlike the policy in *St. Paul Fire*, there is not a grouped listing of parties to which the Court could infer joint consideration. Plaintiff also does not point to any specific language that may suggest otherwise.

Accordingly, the Buy-Sell Agreement does not support the imposition of joint and several liability against the Sutters.

### C. The Court's Proposed Verdict Forms and Jury Instructions Do Not Support Joint and Several Liability.

Lastly, Plaintiff heavily argues that the verdict forms and jury instructions provide a suitable basis for applying joint and several liability because the jury found against Michael Sutter, Jerri Sutter, and NPS with one verdict form *each* and a single damages form. After finding that each defendant had improperly terminated Plaintiff, the jury was asked to complete the damages form by providing the amount of "damages in the form of time loss" it wished to impose. [*See* DE 220 at 4]. As Plaintiff sees it, "[n]othing on the verdict form permitted, let alone required, the jury to apportion that figure among the three Defendants, because there was only one injury to measure: [Plaintiff's] loss of compensation flowing from her termination." [DE 231 at 4]. Moreover, Plaintiff relies on Jury Instruction No. 12, which states that the jury "must give separate consideration to each claim and each party in this case" and that "[a]lthough there are three defendants, it does not follow that if one is liable, any of the others is also liable." [DE 217 at 21]. Plaintiff reads Instruction No. 12 as supporting the application of joint and several liability, both in light of the jury's liability findings against NPS and the Sutters and because of the instruction's omission of language on how to apportion the damages award. [DE 231 at 4].

But it is not clear how these particular verdict forms confirm that joint and several liability is the appropriate method for apportioning the jury's damages award. As the Sutters

rightly point out, the format and language of the verdict forms were a procedural choice made by the Court after considering the parties' submitted proposals. [*See* DE 233 at 7]. None of the parties' proposed forms included language for joint and several liability, [*see* DE 203–05], and no objections were made to the Court's proposed forms, which also lacked such language. [*See* DE 218 (no objections raised on the record nor additional proposals submitted); DE 220 (Court's final proposed verdict forms]. Plaintiff's failure to raise an objection or tender alternative forms weighs against Plaintiff's request at this stage of the proceedings. *See Hess v. Biomet*, 2021 WL 5492616, at *5 (N.D. Ind. Nov. 23, 2021) (finding defendant could not change its position on the structure of the verdict form where no objection was raised prior to trial or after the close of evidence); *Moore v. Hamilton Se. Sch. Dist.*, 2014 WL 12755906, at *3 (S.D. Ind. May 16, 2014) (citing *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 658–59 (7th Cir. 2011)) (finding post-trial objection to verdict form on damages waived where plaintiff failed to object at trial, despite having ample opportunity to do so); *English Coal Co. v. Durcholz*, 422 N.E.2d 302, 311 (Ind. Ct. App. 1981) ("Failure to tender a desired verdict form or to object to the form of the verdict prior to discharge of the jury constitutes waiver of the issue in the absence of a confusing or improper verdict."). Plaintiff's failure to raise joint and several liability in her earlier pleadings or trial briefs only further cements this conclusion. [*See* DE 95 (final amended complaint); DE 161 (Plaintiff's trial brief); DE 210 (Plaintiff's brief addressing time loss)].

As for Plaintiff's reliance on Jury Instruction No. 12, this argument fares no better. The Sutters argue that Instruction No. 12's directive is to evaluate each Defendant's liability independently and treat each actor as being responsible for different obligations. [DE 233 at 8]. Plaintiff contends that the Sutters' reading inverts the instruction's function, that the instruction merely prevents the jury from imputing liability from one defendant to another without proof,

and that the common-law rule for co-obligors should govern. [DE 231 at 4; DE 234 at 9]. But while both interpretations are perhaps true to a degree, it is not clear to the Court how this instruction possesses much, if any, bearing on the question of how relief should be apportioned. Stated differently, Instruction No. 12 is directed to assessing the initial liability—a condition precedent to the actual recovery of relief. Neither Plaintiff's own proposed instructions nor the parties' proposed "Agreed Jury Instructions" contained language on joint and several liability. [*See* DE 195–96]. Moreover, Plaintiff never objected to the Court's proposed final jury instructions filed prior to trial, nor did she object to the Court's final instructions at the jury instruction conference. [*See* DE 199–201; DE 218].

Importantly, this is not to suggest that a party must tender instructions or verdict forms specifying joint and several liability to seek such relief. The Court is unaware of any case law in this jurisdiction requiring as much. Rather, the point is that the Court's forms and instructions—both of which contain no such language indicating joint and several liability—are unsupportive of, or at best neutral to, the common law rule's application where Plaintiff had various opportunities throughout these proceedings to indicate otherwise, yet never took it upon herself to do so. These facts are also, at the very least, distinguishable from cases in which instructions clearly supported the imposition of joint and several liability. *See Abbas v. Neter-Nu*, 261 N.E.3d 233, 244–45 (Ind. 2025) (first and third alterations in original) (affirming application of joint and several liability where the trial court's instructions stated that "regardless of [a defendant's] degree of negligence, they are jointly liable for the entire amount of [the plaintiff's] damages" and that the jury "must return a verdict against all negligent defendants in a single amount for the total damages" without considering "the amount that any individual defendant will pay toward [the] verdict"); *Palmer v. Comprehensive Neurologic Servs., P.C.*, 864 N.E.2d 1093, 1100 (Ind.

Ct. App. 2007) (applying joint and several liability over comparative fault where complaint alleged joint and several liability only and where plaintiff tendered jury instructions alleging joint and several liability, jury was instructed accordingly, and verdict form indicated solely the amount of damages with no apportionment of fault), *trans. denied*.

**D. Conclusion**

For all of these reasons, the Sutters cannot be held jointly and severally liable for the jury's damages award regarding Plaintiff's time loss. NPS is therefore solely responsible for compensating Plaintiff.

**II. <u>Prejudgment and Post-judgment Interest</u>**

The next remedy Plaintiff seeks is prejudgment interest from the date of her termination, as well as post-judgment interest following the entry of this judgment. [DE 231 at 5]. "The award of prejudgment interest is founded solely upon the theory that there has been a deprivation of the plaintiff's use of money or its equivalent and that unless interest is added, the plaintiff cannot be fully compensated for the loss suffered." *Crawford Cnty. Cmty. Sch. Corp. v. Enlow*, 734 N.E.2d 685, 692 (Ind. Ct. App. 2000), *trans. denied*. "Prejudgment interest is recoverable not as interest but as additional damages to accomplish full compensation." *Id.* For a breach of contract action, an award of prejudgment interest is warranted if "the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable." *Lash v. Kreigh*, 202 N.E.3d 1098, 1105 (Ind. Ct. App. 2023) (quoting *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 169–70 (Ind. Ct. App. 2004), *trans. denied*). To determine whether an award of prejudgment interest is appropriate, the inquiry is "whether the damages are complete and may be ascertained at a particular time." *Id.* "The award is considered proper when the trier of fact does not have to

exercise its judgment to assess the amount of damages." *Id.* As the Indiana Court of Appeals has further clarified:

> [T]he crucial factor in determining whether damages in the form of prejudgment interest are allowable is whether the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation. An award of prejudgment interest is proper only where a simple mathematical computation is required. Damages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest.

*Clark v. Hunter*, 861 N.E.2d 1202, 1208 (Ind. Ct. App. 2007) (quoting *Bopp v. Brames*, 713 N.E.2d 866, 872 (Ind. Ct. App. 1999), *trans. denied*).

Here, Plaintiff argues that her "time loss" damages were clearly calculated using her salary for the calendar year immediately preceding her termination ($141,914), which was applied as an annualized rate of back pay running from her termination on March 3, 2022, through the date of the verdict. [DE 231 at 6]. Plaintiff argues this is the type of "simple calculation" the case law describes: two fixed inputs (an undisputed salary figure and a known date range), and no competing valuation methodologies. [*Id.*]. In contrast, NPS and the Sutters contend that prejudgment interest should not be awarded for three reasons: first, because taking a case before a jury is the ultimate request for an exercise of judgment; second, because Plaintiff requested varied damages with different calculations; and third, because Plaintiff's requested damages amount varied significantly from both the defendants' argued amount and the amount actually awarded by the jury. [DE 232 at 4].

To begin, Plaintiff is correct that simply because the matter went before a jury, this alone does not mean that the jury necessarily exercised its judgment in rendering an award. If it did, then this would logically foreclose the consideration of prejudgment interest anytime a case proceeds to trial. Not only this, but Indiana case law is clear that prejudgment interest may either be left to the jury or advanced by means of a post-trial motion for the trial court's consideration.

*See R.K.W. Homes, Inc. v. Hutchison*, 198 N.E.3d 405, 411–12 (Ind. Ct. App. 2022) (citing *Bd. of Works of the City of Lake Station v. I.A.E., Inc.*, 956 N.E.2d 86, 96 (Ind. Ct. App. 2011); *WESCO Distrib., Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 714–15 (Ind. Ct. App. 2014)), *trans. denied*. Likewise, it is also true that prejudgment interest is not precluded merely because a jury awarded a lesser amount than that requested. *See id.* at 413–14 (finding the plaintiff was entitled to prejudgment interest despite jury awarding only $58,500 of the initial $132,423.32 request).

That being said though, it does appear that the jury exercised its judgment in rendering the damages award here. More specifically, Plaintiff presented to the jury a lump sum amount of $742,086.67 comprising backpay, a car stipend, health insurance benefits, and profit shares, all of which collectively constituted her "time loss" under the Buy-Sell Agreement. [DE 218]. Each of these values, as discussed on the record by counsel during the trial, were calculated at different rates. Moreover, the Sutters and NPS contend that Plaintiff's numbers were vastly different than those offered by them, suggesting these damages were the subject of a good faith dispute. *See Clark*, 861 N.E.2d at 1208 (finding prejudgment interest was not warranted where trial court exercised its judgment to assess the amount of damages for breach of contract claim at 80% of the contract price and where judgment reflected good faith dispute over total amount of damages); *J.S. Sweet Co. v. White Cnty. Bridge Comm'n*, 714 N.E.2d 219, 225 (Ind. Ct. App. 1999) (finding prejudgment interest for bridge deck patching was unwarranted where good faith dispute existed over calculations for removal and patching and the trial court had to determine the amount owed). Finally, it is unclear which of these values the jury ultimately determined should be included in the final damages award. With just a general verdict, it is impossible to conclude without some interpretation which, if any, values included in the jury's damages award

were readily ascertainable. *See WESCO*, 23 N.E.3d at 715 (finding jury exercised its judgment in arriving at a damages amount ten million dollars less than that requested where the jury did not award as a lump sum the entire amount of property damages claimed by the plaintiff). Given the roughly $200,000 discrepancy between Plaintiff's request and the jury's actual award, it is apparent the jury made one or more significant judgment calls in deciding which damages to include, as well as which ones to exclude. Therefore, prejudgment interest for Plaintiff's time loss is not proper.

Plaintiff, however, may acquire post-judgment interest for the jury's damages award. Post-judgment interest in federal court is governed by 28 U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in district court," and that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." According to the Federal Reserve's data for the week preceding the entry of this judgment,[10] the one-year maturity constant is 4.47%. Therefore, beginning Friday October 16, 2026, post-judgment interest will accrue on the damages award at a rate of $67.35 per day until the judgment principle is satisfied in full. And as with the damages award, NPS will be responsible for paying the post-judgment interest on the award.

**III. Attorney's Fees**

Plaintiff next argues that she is entitled to reasonable attorney's fees. [DE 231 at 8]. "Generally, Indiana follows the American rule, which requires each party to pay his or her own attorney fees." *Smith v. Foegley Landscape, Inc.*, 30 N.E.3d 1231, 1239 (Ind. Ct. App. 2015).

[10] *See Selected Interest Rates (Daily) – H.15*, FEDERAL RESERVE, https://www.federalreserve.gov/releases/h15/ (last visited Oct. 15, 2026).

Therefore, "an award of attorney fees is not allowable in the absence of a statute, agreement or stipulation authorizing such an award." *Harco, Inc. of Indianapolis v. Plainfield Interstate Fam. Dining Assocs.*, 758 N.E.2d 931, 940 (Ind. Ct. App. 2001).

Here, Plaintiff does not cite an applicable statute, nor does she refer to the Buy-Sell Agreement, as that document lacks a provision on attorney's fees. Instead, Plaintiff directs the Court to Article X(a) of the NPS Bylaws, which states:

> Any person made a party to any action, suit or proceeding, by reason of the fact that he . . . is or was a director, officer or employee of the Corporation . . . shall be indemnified by the Corporation against the reasonable expenses, including attorney's fees, actually and necessarily incurred by him in connection with the defense of such action, suit or proceedings . . . except in relation to matters as to which it shall be adjudged . . . that such officer, director or employee is liable for negligence or misconduct in the performance of his duties.

[DE 231 at 8 (quoting DE 231-2 at 14)]. Plaintiff argues that she satisfies Article X(a)'s threshold requirement that she "was made a party" to this action "by reason of the fact that" she was a director, officer, and employee of NPS because NPS' termination of her employment and seizure of her shares "compelled" her to bring suit to undo corporate actions already taken against her. [*Id.*]. She further argues that although the Bylaws do not define the term "defense," this suit was effectively an attempt to "defend" her stock ownership and position with NPS. [*Id.* at 8–9]. In response, NPS and the Sutters contend that Plaintiff was not *made* a party to this lawsuit because she was the one who initiated it, and further, she failed to plead a claim against NPS for indemnification. [DE 232 at 5; DE 233 at 9].

Addressing first the matter of whether Plaintiff pleaded a claim for indemnification, she did not explicitly state that she was seeking "indemnification" in her amended complaint. She did, however, request attorney's fees for her breach of fiduciary duty claim. [*See* DE 95 at 11]. This, coupled with the fact that she introduced the Bylaws as an exhibit at trial, [*see* DE 221, Ex.

E], reasonably suggests that she intended to invoke the attorney's fees provision to some extent, whether or not it was for indemnification proper. Moreover, while the breach of fiduciary duty claim was ultimately dismissed at trial, the events and facts surrounding that claim were relatively intertwined with those concerning her breach of contract claim since both concerned her termination from NPS. It therefore appears that Plaintiff's request for attorney's fees is open to consideration. *See Nardi v. King*, 253 N.E.3d 1098, 1107–08 (Ind. 2025) (internal quotation marks omitted) ("Although a plaintiff may not recover fees for time expended pursuing unsuccessful claims which are unrelated to those claims upon which the plaintiff ultimately prevailed, the plaintiff may recover fees upon related claims."); *Nagy v. Evansville-Vanderburgh Sch. Corp.*, 870 N.E.2d 12, 25 (Ind. Ct. App. 2007) (awarding attorney's fees for an unresolved federal due process claim because it was related to a successful state constitutional claim where both were intended to stop a school corporation from charging a fee to all students).

Having addressed that point, the Court next looks to the language of the Bylaws. Under Indiana law, a corporation's articles of incorporation and bylaws constitute a contract between the corporation and the state, the corporation and its members, and among the members themselves. *See Heritage Lake Prop. Owners Ass'n, Inc. v. York*, 859 N.E.2d 763, 765 (Ind. Ct. App. 2007) (citing *Nat'l Bd. of Exam'rs for Osteopathic Physicians and Surgeons, Inc. v. Am. Osteopathic Ass'n*, 645 N.E.2d 608, 617 (Ind. Ct. App. 1994)). Therefore, "[w]hen construing corporate organizational documents, the general rules of contract interpretation apply." *Id.* The primary task of contract interpretation is to determine and implement the parties' intent when they entered the contract. *Wohlt v. Wohlt*, 245 N.E.3d 611, 616 (Ind. 2024). The first step in doing so is to look at the plain language of the agreement. *Id.* When reviewing an unambiguous written contract, the court should only look to the "four corners" of the document, considering

both what the contract does, and does not, say. *Id.* (citing *U.S. Automatic Sprinkler Corp. v. Erie Ins. Exch.*, 204 N.E.3d 215, 223 (Ind. 2023)); *see also Robinson v. Nunley*, 273 N.E.3d 117, 121 (Ind. Ct. App. 2025) ("noting that the "four corners" rule provides that "extrinsic evidence is not admissible to add to, vary[,] or explain the terms of a written instrument if the terms are susceptible of a clear and unambiguous construction"). Contract interpretation in this regard is generally a question of law for the Court. *Wohlt*, 245 N.E.3d at 616 (citing *Bailey v. Mann*, 895 N.E.2d 1215, 1217 (Ind. 2008)).

Here, the parties' primary interpretative dispute is whether Plaintiff was "**made a party** to any action, suit or proceeding, by reason of the fact that [she] . . . is or was a director, officer or employee of the Corporation," and further, whether any damages she claims to be entitled to were "actually or necessarily incurred by [her] **in connection with the defense of such action**, suit or proceedings . . . ." [*See* DE 231-2 at 14 (emphases added)]. As the Court reads this provision, which it finds to be unambiguous, Plaintiff is not entitled to attorney's fees because she was neither "made a party" to the suit nor did she incur damages "in connection with the defense of" the suit.

Here, Plaintiff sued NPS and the Sutters regarding her termination of employment. It does not stand reason that a party can simply be "made a party" to a suit just by initiating it. If that were the case, then according to the Bylaws, it seems NPS would have to indemnify both Plaintiff *and* the Sutters because each were involved in the suit by reason of either being officers or employees of NPS. This appears contrary to the purpose of indemnification, which later language in the provision suggests is to protect those sued for acts performed while operating in good faith for, or on behalf of, NPS. [*Cf.* DE 231-2 at 14 (excluding from indemnification employees, officers, or directors adjudged *to be liable* for negligence or misconduct while

performing their duties)]. Furthermore, because Plaintiff's costs were derived from her prosecution of the suit, it is antithetical to allow her to reclaim those costs when the plain language of the provision specifically limits damages to those incurred *in defense* of the suit. Accordingly, the Bylaws do not support Plaintiff's request for attorney's fees.

**IV. <u>Equitable Relief</u>**

Lastly, the Court must address Plaintiff's request for equitable relief. [DE 231 at 10]. When Plaintiff was terminated, NPS exercised its right under Paragraph 4 of the Buy-Sell Agreement to acquire Plaintiff's stock for 50% of its purchase value. [*See* DE 95 at 9; DE 217 at ⁋⁋ 44–46; DE 231-1 at ⁋ 4]. That stock has remained in escrow throughout these proceedings. [DE 217 at ⁋ 47]. Following the initiation of this suit, under Count 1 of her amended complaint, Plaintiff brought a declaratory action against NPS seeking, summarily, a declaration that the 2022 Notice of Acquisition letter that Defendants' counsel served on Plaintiff be deemed null and void. [DE 95 at 10]. She further requested that her employment be reinstated and that her stock be retained, as provided for in the Buy-Sell Agreement. [DE 231 at 10].[11]

According to 28 U.S.C. § 2201(a), where there is jurisdictional authority to do so and such relief has been appropriately pled, a district court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Paragraph 15(c) of the Buy-Sell Agreement provides that where an employee is

[11] Plaintiff also requested in Count 1 of her amended complaint that she receive a monetary award in an amount exceeding $1.5 million dollars for the value of her shares, an amount purportedly based on a letter of intent to purchase from a third-party and a life insurance payout following Donald Gaza's death. [DE 95 at 10; *see* DE 190 (discussion of share value at final pretrial conference)]. The Court, however, found that the Buy-Sell Agreement set the share value under Paragraph 9(a) and Schedule B at $20,000 per share, and because Schedule B was never updated, $20,000 per share remains the going rate. [*See* DE 190; DE 231-1 at ⁋ 9(a), Schedule B]. Further, because Plaintiff's shares were never sold but have instead sat in escrow pending the outcome of this suit, there were no monetary damages to recover anyway. Accordingly, the Court held in its Order on Contract Damages that Plaintiff's only recoverable damages were for her "time loss," and that Plaintiff may separately seek the retainment of her stock. [DE 213 at 7].

improperly terminated, "the employee shall be reinstated and fully compensated for the time loss resulting from termination and shall retain such Stock that was sold." [*Id.* (quoting DE 231-1 at ⁋ 15(c))]. Here, the jury found NPS improperly terminated Plaintiff for cause. [DE 217]. Relying on this finding, it is clear under the plain language of the Buy-Sell Agreement that Plaintiff is entitled to the reinstatement of her employment and the retainment of her shares. Furthermore, because Plaintiff is entitled to the retainment of her shares, it is likewise appropriate to declare the 2022 Notice of Acquisition letter null and void.

**CONCLUSION**

For these reasons, the Court **GRANTS IN PART, DENIES IN PART** Plaintiff's Motion for Entry of Judgment [DE 231]. Specifically, the Court holds as follows:

- Plaintiff's request for joint and several liability against all three of the named defendants is **DENIED**. Only NPS is liable for paying the $550,000 damages award.
- Plaintiff's request for prejudgment interest is **DENIED**.
- Plaintiff's request for post-judgment interest is **GRANTED**. Beginning on the date of this judgment's entry, interest will accrue on the damages award at a rate of $ 67.35 per day until the principle has been fully satisfied. NPS is responsible for payment of the interest award.
- Plaintiff's request for attorney's fees is **DENIED**.
- Plaintiff's request for declaratory relief against NPS is **GRANTED**. It is hereby declared, adjudged, and decreed that the 2022 Notice of Acquisition letter is null and void, that Plaintiff is entitled to reinstatement of her employment and retainment of her shares under the Buy-Sell Agreement, and that NPS is

**ORDERED** to reinstate Plaintiff's employment with the corporation and return the entirety of her issued stock to her.

- Finally, because this Opinion and Order ends the merits review of all issues in this matter, the Clerk of Court is **DIRECTED** to close this case.

SO ORDERED.

ENTERED: October 16, 2026

/s/ GRETCHEN S. LUND
Judge
United States District Court